UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Abdelkader Al Hawasli,                     Chapter 7
                                           Case Number 24-45578
    Debtor                                 Hon. Mark A. Randon
_____/

Saja Mikhail,

    Plaintiff,

v.                                         Adversary Case Number 24-04378

Abdelkader Al Hawasli,

    Defendant.
_____/

**POST-TRIAL OPINION AND ORDER OVERRULING
PLAINTIFF'S OBJECTION TO DEFENDANT'S CHAPTER 7 DISCHARGE**

**I.    INTRODUCTION**

Debtors in bankruptcy must be honest and financially transparent. Judgment creditor, Saja Mikhail, says Chapter 7 debtor, Abdelkader Al Hawasli, was neither and objects to his discharge. At issue is whether Hawasli, a medical doctor, made fraudulent transfers with the intent to hinder or delay his creditors, or knowingly made materially false statements or omissions on his bankruptcy schedules and Statement of Financial Affairs ("SOFA") with fraudulent intent. Either would be fatal to his discharge.

After Mikhail was awarded a $3.5 million medical malpractice judgment against Hawasli, he filed Chapter 7 bankruptcy; Mikhail filed this adversary proceeding challenging Hawasli's discharge under 11 U.S.C. § 727(a)(2)(A) and 11 U.S.C. § 727(a)(4)(A).[1]  The Court conducted a trial on June 17, 2025, and June 26, 2025.  The parties stipulated to the admission of all exhibits, and after closely observing the witnesses' demeanor, the Court finds the testimony of Hawasli, Michael David Lorenz, and Wilson A. Copeland II credible.[2]

Although the timing and amount of some of Hawasli's pre-petition transfers raise concerns, and were perhaps even ill-advised in hindsight—context matters.  Because: (1) Hawasli's explanation for his transfers was credible; (2) his substantial financial investments with, and money transfers to, his children were consistent and began long before he was aware of Mikhail's legal claims against him; (3) he firmly believed Mikhail's malpractice allegations were meritless and would not succeed; and (4) his schedules and SOFA, along with his supplemental disclosures to the Chapter 7 Trustee, provided a sufficient and truthful account of his financial circumstances, the Court **OVERRULES** Mikhail's objection to his discharge.

---

[1] The complaint alleged denial of discharge under 11 U.S.C. §§727(a)(4), 727(a)(2), 727(a)(5), and 727(a)(3) in additional to a count for nondischargeability under 11 U.S.C. § 523(a)(6). At trial, the parties agreed that sections 727(a)(2)(A) and 727(a)(4)(A) were the only relevant causes of action.

[2] Mikhail also testified.  Her testimony was not germane to the issues the Court must decide.

## II. JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(J); the Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and § 157(a).

## III. FINDINGS OF FACTS

### A. *Time Line of Important Events*

The Court constructs the following time line based on the testimony and exhibits admitted at trial:

1. In 2013, Hawasli bought vacant land in Grosse Pointe Shores on a land contract.

2. On November 1, 2017, Hawasli & Associates Surgical Specialists, P.C. ("HASS") entered into a Software Development Agreement with Tahmeel Fze ("Tahmeel"), a limited liability free zone entity located in Dubai—and owned by his son Mouhammad—to develop the Doctor Online application ("Dronline") meant to connect patients in Dubai, and elsewhere, with physicians in the United States.

3. On May 3, 2018, after the land contract was paid off, Hawasli and his wife entered into a New Construction Contract with HGW Detroit LLC d/b/a Hawasli Homes LLC—owned by his son Waref—to build an 11,500 square foot custom estate at 707 Lake Shore Road in Grosse Pointe Shores for $4,314,005.05.[3]

4. On December 12, 2018, Hawasli performed a thyroidectomy to treat Mikhail's thyroid cancer.

---

[3]Hawasli obtained a construction loan from First State Bank solely in his name. The loan was subsequently converted to a mortgage that included his wife's name, but this occurred outside the 2-year look back period.

-3-

5. In December 2020, Hawasli received Mikhail's notice of intent to file a medical malpractice lawsuit.

6. On June 10, 2021, Mikhail filed a complaint in the Wayne County Circuit Court against Hawasli for medical malpractice.

7. On October 5, 2022, Hawasli's company, 12 Mile Associates, LLC, sold a medical building; HASS received $1,700,000.[4]

8. On January 4, 2023, Hawasli received $803,925.67 for his Federal income tax refund.

9. On January 12, 2023, Hawasli received $97,634.56 for his State income tax refund.

10. On May 1, 2023, Hawasli and his wife entered into a Subscription Agreement with Tahmeel whereby they agreed to pay a total of $5 million in monthly installments of not less than $40,000 in exchange for a 25 percent shareholder interest in the company.

11. On May 30, 2023, Mikhail's medical malpractice lawsuit was initially scheduled for trial.

12. On September 5-8, 2023, Mikhail's medical malpractice lawsuit went to trial.

13. On September 12, 2023, the jury rendered a verdict against Hawasli.

14. On January 12, 2024, a judgment was entered against Hawasli in a total amount of $3,509,559.49 broken down as follows:

   A. Post noneconomic damages - $34,680

   B. Future economic damages reduced to present cash value - $3,347,442.49

   C. Future noneconomic damages reduced to present cash value - $74,949.04

---

[4] Hawasli used the proceeds to pay income taxes, Hawasli Homes, and Dronline.

      D.      Pre-judgment interest through January 5, 2024 - $2,487.96

      E.      Taxable costs - $50,000.

15. On April 14, 2024, the trial court entered an injunction precluding Hawasli from funding Dronline and the Subscription Agreement.

16. On June 6, 2024, Hawasli filed Chapter 7 bankruptcy.

### B. *Hawasli's Background*

Hawasli is a 71 year old man who has been married to Huda Hawasli since 1978. They have three sons, Mouhammad, Waref, and Ayhem; and one daughter, Bianca. Hawasli started his medical career as a general surgeon in 1985. In December 2019, Hawasli sold HASS and began working at Ascension St. John Medical Group. Hawasli is also the director of bariatric surgery at University of Toledo Physicians LLC. He earns approximately $39,000 per month from Ascension St. John Medical Group and receives a W-2. His income from Ascension St. John Medical Group is through a 1099. In total, Hawasli's yearly salary has historically been between $900,000 to $1 million. However, his stipends were reduced in 2024, which means his salary will decrease significantly moving forward.

### C. *Mikhail's Medical Malpractice Lawsuit*

Mikhail began coming to HASS for unrelated surgeries as early as 2010. Years later, she developed thyroid cancer. The cancer was operable, and she chose Hawasli to conduct the surgery. While Hawasli successfully removed the cancer cells, he also

-5-

24-04378-mar    Doc 99    Filed 07/14/25    Entered 07/14/25 11:28:50    Page 5 of 16

removed Mikhail's four tiny parathyroid glands.[5]  Believing Hawasli's unintentional removal of her parathyroid glands was negligent, Mikhail sent Hawasli a notice of intent to file a medical malpractice lawsuit.  Six months later, she filed a medical malpractice complaint.[6]

Attorney Wilson A. Copeland II represented Hawasli in the medical malpractice lawsuit.[7] He was comfortable with the surgery Hawasli performed, assured Hawasli that he was absent any professional negligence, and believed the case was fully defensible. Nevertheless, following a jury trial, a $3,509,559.49 judgment was entered against Hawasli.  The judgment—which precipitated Hawasli's bankruptcy—is currently on

---

[5]The parathyroid glands make and release parathyroid hormone ("PTH").  PTH regulates calcium, phosphorus, and vitamin D levels in the blood.  Low PTH levels (hypoparathyroidism) cause low blood calcium levels and high phosporous levels. *See* Cleveland Clinic: Parathyroid Hormone, *available at*, https://my.clevelandclinic.org/health/articles/22355-parathyroid-hormone (last visited July 12, 2025).  The most common cause of hypoparathyroidism "can happen after the parathyroid glands get damaged by mistake or removed during surgery.  Neck surgery may be done to treat conditions of the thyroid gland, or to treat throat or neck cancer." *See* Mayo Clinic: Hypoparathyroidism, *available at* https://mayoclinic.org/diseases-conditions/hypoparathyroidism/symptoms-causes/syc-20355375 (last visited July 12, 2025).

[6]According to Hawasli, less than 5-10 percent of notices of intent to file a claim actually result in a formal complaint.

[7]Attorney Wilson A. Copeland II has been a licensed attorney for 51 years specializing in representing the interests of health care professionals.

appeal.[8]  Before Hawasli's bankruptcy, Mikhail had not collected any money on the judgment.

### D. *Hawasli's Speculative Business Investments*

In 2010, Hawasli worked with H&A Nutrition to develop a protein powder for bariatric surgery patients. Hawasli's investment lost money, and the company closed due to the stiff competition in the market for similar supplements.

Between 2017 and 2024, Hawasli invested approximately $5 million in Dronline. The bulk of the money invested through Tahmeel was made before 2021. To date, Hawasli has made nothing from this investment.

Hawasli invested $615,000-$620,000 of an expected $5 million in the Subscription Agreement, through Tahmeel, believing the company was worth approximately $20 million and he could use the returns on his investment to fund his retirement. Hawasli has never received any distributions or profits from the Subscription Agreement.

### E. *Hawasli's History of Financial Involvement with his Children*

---

[8]Hawasli's argument on appeal is that the district court improperly allowed testimony about TransCon, which is an injectable drug that was not yet approved by the FDA. It has subsequently been approved by the FDA.

Hawasli has a history of significant financial involvement with his children that predates his awareness of Mikhail's medical malpractice complaint. Besides his multi-million dollar investment in Dronline, through his son Mouhammad's company in Dubai, Tahmeel, in 2018, Hawasli entered into a $4,314,005.05 construction contract to build a home in Grosse Pointe Shores with HGW Detroit LLC (Hawasli Homes), owned by his son Waref. At various times, Hawasli's third son, Ayhem, has worked as a manager in his medical office; his daughter, Bianca, has also worked in various capacities in his medical office (from a biller to office manager), and she worked for Dronline in testing and promotion. Following her mother's back surgery in 2019, Bianca has also provided caregiving and transportation services for her mother. Hawasli periodically pays his daughter for these services, which would otherwise require the retention and compensation of a third party.

### F. Hawasli's Transfers of Money

Admittedly, Hawasli has made several transfers from his personal bank account, his joint account with his wife, and the HASS business account—an account he maintained after HASS closed to make transfers and pay bills because the bank costs were higher to transfer money overseas from a personal account instead of business account.[9] While there are more, the Court finds the timing of the transfers made to

---

[9]Michael David Lorenz is a Certified Public Accountant and licensed attorney who has worked with Hawasli for 15-20 years. He testified that Hawasli has been putting money in and taking money out of the HASS bank account since its date of incorporation because it is an S corp that is not taxable.

Bianca and Hawasli Homes, to fund the Subscription Agreement, and in support of Dronline require close scrutiny. Attached to Hawasli's SOFA is a four page single spaced spreadsheet that lists 81 transfers made from his personal and joint bank accounts. The timing and amounts of the following transfers are relevant:

<u>Date Mikhail Filed Her Complaint Until the Initial Trial Date</u>
Total Payments to Hawasli Homes - $55,000
Total Payments to Bianca - $80,427.47, which includes a $75,000 gift for down payment for a home

<u>Initial Trial Date Until the Actual Trial</u>
Total Payments to Hawasli Homes - $10,000

<u>Actual Trial Until Judgment Entered</u>
Total Payments to Bianca - $21,000
Total Payments to Hawasli Homes - $174,494.14
Total Payments for Dronline - $50,000

<u>Post-Judgment</u>
Total Payments to Bianca - $12,000, which includes a $4,000 gift for her kids' tuition
Total Payments to Hawasli Homes - $10,000

Hawasli also provided a 13 page spreadsheet to the Chapter 7 Trustee at the beginning of the case and to counsel for Mikhail. Eight of the 13 pages listed transfers from his business accounts. Included in that spreadsheet are the timing and amounts of the following relevant transfers from the HASS business account:

<u>Date Mikhail Filed Her Complaint Until the Initial Trial Date</u>
Total Payments for the Dronline - $640,500
Total Payments to Hawasli Homes - $740,891.20
Total Payments to Bianca - $6,000

-9-

24-04378-mar    Doc 99    Filed 07/14/25    Entered 07/14/25 11:28:50    Page 9 of 16

Actual Trial Until Judgment Entered
Total Payments to Tahmeel for either the Subscription Agreement or Dronline - $180,000
Total Payments for Dronline - $50,000
Total Payments to Hawasli Homes - $35,000

Post-Judgment
Total Payments to Hawasli Homes - $48,800
Total Payments for Dronline - $25,000
Total Payments to Tahmeel for either the Subscription Agreement or Dronline - $40,000

## IV. CONCLUSIONS OF LAW

As an initial matter, the Court recognizes that Federal Bankruptcy Rule 4005 provides that "[a]t a trial on a complaint objecting to a discharge, the plaintiff [Mikhail] has the burden of proof." In addition, "exceptions to discharge are to be strictly construed against the creditor." *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998)

### A. Section 727(a)(2)(A)

Mikhail argues that Hawasli should be denied a discharge under 11 U.S.C. § 727(a)(2)(A):

> The court shall grant the debtor a discharge, unless–the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed . . . –property of the debtor, within one year before the date of the filing of the petition.

Fraudulent intent requires actual–not constructive–fraud. However, because debtors rarely admit fraudulent intent, it may be inferred from the circumstantial evidence. *United States Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 78-79 (Bankr. S.D. Ohio 2012). "[A] finding of fraudulent intent is a question of fact that is highly dependent on the

-10-

24-04378-mar    Doc 99    Filed 07/14/25    Entered 07/14/25 11:28:50    Page 10 of 16

bankruptcy court's assessment of the debtor's credibility." *Jahn v. Hughes (In re Hughes)*, 490 B.R. 784, 792 (Bankr. E.D. Tenn. 2013) (internal quotations and citation omitted).

The timing of some of Hawasli's transfers, particularly to the businesses of his sons, Mouhammad and Waref, are concerning because they were made during a time period in which Hawasli faced the possibility of a money judgment. But Hawasli provided a completely credible and detailed explanation for the transfers. Given the history of Hawasli's investments, the fact that he has been making speculative business investments since 2010, the financial transfers to his children and their businesses—many of which predated Mikhail's allegations of malpractice—and Hawasli's (and his lawyer's) firm belief that he was in no legal or financial jeopardy from her lawsuit, Mikhail failed to prove that Hawasli made the transfers with intent to hinder, delay, or defraud a creditor. *See Apartments at Cambridge Co., L.L.C. v. Lewiston (In re Lewiston)*, 537 B.R. 808, 834 (E.D. Mich. 2015) (finding that the disposition of property had to be made with the subjective intent to defraud). Believing his medical intervention saved Mikhail's life, Hawasli simply continued to conduct business as he had always done.

### B. *Section 727(a)(4)(A)*

Section 727(a)(4)(A) directs the Court to grant a discharge unless: "the debtor knowingly and fraudulently, in or in connection with the case – made a false oath or

account[.]" 11 U.S.C. § 727(a)(4)(A).  To deny a debtor's discharge under this section, a plaintiff must demonstrate–by a preponderance of the evidence–that:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000).  Statements made on debtor's bankruptcy schedules, SOFA, and at his 341 meeting are all statements made under oath. *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (6th Cir. BAP 1999)).  Whether a debtor's statements or omissions constitute a false oath under section 727(a)(4)(A) is a question of fact.  *In re Keeney*, 227 F.3d at 685.

The right to a discharge in bankruptcy is liberally construed. *Newman v. Burnham (In re Newman)*, 126 F.2d 336, 337 (6th Cir. 1942) (citations omitted); *see also In re Keeney*, 227 F.3d at 683.  "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural.  A debtor is entitled to a starting presumption that most debtors are honest and do not ordinarily engage in fraudulent activities." *Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 727 (Bankr. E.D. Mich. 2003).

To obtain a discharge, debtors must be completely transparent about their finances. *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) ("A debtor has an affirmative duty to disclose all of [his] assets to the bankruptcy court[.]"); *In re Cutler*, 291 B.R. at 726

-12-

(noting that a deliberate omission from the debtor's schedules may be grounds for denying a discharge). "[I]ntent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Keeney*, 227 F.3d at 685 (internal quotations omitted). It may also be established by a debtor's material misrepresentation made with reckless disregard as to its truth. *Id*. at 686.

Fraudulent intent requires actual–not constructive–fraud. However, because debtors rarely admit fraudulent intent, it may be inferred from the circumstantial evidence. *In re Cutler*, 291 B.R. at 726 (quoting *Rouse v. Stanke (In re Stanke)*, 234 B.R. 449, 458 (Bankr. W.D. Mo. 1999)). For example, "[a] series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive." *In re Cutler*, 291 B.R. at 726 (quoting *Rouse v. Stanke (In re Stanke)*, 234 B.R. 449, 458 (Bankr. W.D. Mo. 1999)). But if the false information is the result of mistake or inadvertence, the debtor remains entitled to a discharge. *McDermott v. Schwartz (In re Schwartz)*, No. 12-66764, 2015 WL 1010490, at *6 (Bankr. E.D. Mich. March 3, 2015) (quoting *In re Keeney*, 227 F.3d at 685-86). "[A] finding of fraudulent intent is a question of fact that is highly dependent on the bankruptcy court's assessment of the debtor's credibility." *Jahn v. Hughes (In re Hughes)*, 490 B.R. 784, 792 (Bankr. E.D. Tenn. 2013) (internal quotations and citation omitted); *Harker v. West (In re West)*, 328 B.R. 736, 750 (Bankr. S.D. Ohio 2004) ("[R]esolution of the question of whether a false

statement was made with intent to deceive will [often] turn on the Court's assessment of the demeanor and credibility of the debtor.")

The Court observed the demeanor of all witnesses—and particularly scrutinized Hawasli—while they testified. They were all credible and Hawasli provided a reasonable explanation for his failure to list the transfers from the HASS account on the SOFA or the spreadsheet that was attached to the SOFA.

Hawasli explained that he believed the SOFA only required him to disclose personal transfers, not transfers made from his business account as the business was not in bankruptcy. Without ruling on whether Hawasli was required to list business transfers, the Court accepts it as an open question. Based on a review of the SOFA, however, the Court accepts Hawasli's explanation that he only had to list personal transfers. For example, Part 3 Question 7 of the SOFA asks, "Within 1 year before you filed for bankruptcy, did *you* make a payment on a debt you owed anyone who was an insider?" (Emphasis added). Part 5 Question 13 asks, "Within 2 years before you filed for bankruptcy, did *you* give any gifts with a total value of more than $600 per person?" (Emphasis added). Part 7 Question 18 asks, "Within 2 years before you filed for bankruptcy, did *you* sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?" (Emphasis added). Even if Hawasli's failure to disclose the transfers from his business

account constitutes a material omission, it was not done with fraudulent intent. He plausibly believed his personal transfers were all he was required to provide.

Notwithstanding his belief, Hawasli went above and beyond his understanding of what the SOFA required and disclosed his business transfers in a spreadsheet that was provided to the Chapter 7 Trustee at the beginning of the case. Even though this spreadsheet was not signed under oath, the Trustee had it in his possession during the 341 Meeting of Creditors, which was conducted under oath. The upshot is that Hawasli was completely transparent with both his personal and business transfers; Mikhail failed to prove the requisite fraudulent intent for denial of discharge under section 727(a)(4)(A). *See SunTrust Bank v. Mitchell (In re Mitchell)*, 496 B.R. 625, 632 (Bankr. N.D. Fla. 2013) ("the most essential [duty of Chapter 7 debtors] is the complete and honest disclosure of assets and recent transfers by the debtor.")

## V. CONCLUSION

Because: (1) Hawasli's explanation for his transfers was credible; (2) his substantial financial investments with, and money transfers to, his children were consistent and began long before his awareness of Mikhail's legal claims against him; (3) he firmly believed Mikhail's malpractice allegations were without merit and would not succeed; and (4) his schedules and SOFA, along with his supplemental disclosures to the

Chapter 7 Trustee, provided a sufficient and truthful account of his financial circumstances, the Court **OVERRULES** Mikhail's objection to his discharge under sections 727(a)(2)(A) and 727(a)(4)(A).

    **IT IS ORDERED**.

**Signed on July 14, 2025**



/s/ Mark A. Randon
**Mark A. Randon**
**United States Bankruptcy Judge**